## COMPLETE AUTO TRANSIT, INC. *v.* BRADY, CHAIRMAN, MISSISSIPPI TAX COMMISSION

No. 76–29.   Argued January 19, 1977—Decided March 7, 1977

BLACKMUN, J., delivered the opinion for a unanimous Court.

*Alan W. Perry* argued the cause for appellant.   With him on the briefs were *Robert C. Cannada, George H. Butler, D. Carl Black,* and *Rhesa H. Barksdale.*

*James H. Haddock* argued the cause and filed a brief for appellee.

MR. JUSTICE BLACKMUN delivered the opinion of the Court.

Once again we are presented with " 'the perennial problem of the validity of a state tax for the privilege of carrying on, within a state, certain activities' related to a corporation's operation of an interstate business." *Colonial Pipeline Co.* v. *Traigle,* 421 U. S. 100, 101 (1975), quoting *Memphis Gas Co.* v. *Stone,* 335 U. S. 80, 85 (1948).   The issue in this case is whether Mississippi runs afoul of the Commerce Clause, U. S. Const., Art. I, § 8, cl. 3, when it applies the tax it imposes on "the privilege of . . . doing business" within the State to appellant's activity in interstate commerce.   The Supreme Court of Mississippi unanimously sustained the tax against

appellant's constitutional challenge. 330 So. 2d 268 (1976). We noted probable jurisdiction in order to consider anew the applicable principles in this troublesome area. 429 U. S. 813 (1976).

## I

The taxes in question are sales taxes assessed by the Mississippi State Tax Commission against the appellant, Complete Auto Transit, Inc., for the period from August 1, 1968, through July 31, 1972. The assessments were made pursuant to the following Mississippi statutes:

> "There is hereby levied and assessed and shall be collected, privilege taxes for the privilege of engaging or continuing in business or doing business within this state to be determined by the application of rates against gross proceeds of sales or gross income or values, as the case may be, as provided in the following sections." Miss. Code Ann., 1942, § 10105 (1972 Supp.), as amended.[1]

> "Upon every person operating a pipeline, railroad, airplane, bus, truck, or any other transportation business for the transportation of persons or property for compensation or hire between points within this State, there is hereby levied, assessed, and shall be collected, a tax equal to five per cent of the gross income of such business . . . ." § 10109 (2), as amended.[2]

---

[1] The statute is now § 27-65-13 of the State's 1972 Code.

[2] This statute is now § 27-65-19 (2) of the 1972 Code. It was amended, effective August 1, 1972, to exclude the transportation of property. 1972 Miss. Laws, c. 506, § 2.

Section 10109, as codified in 1942, imposed a tax on gross income from all transportation, with gross income defined to exclude "so much thereof as is derived from business conducted in commerce between this State and other States of the United States . . . which the State of Mississippi is prohibited from taxing under the Constitution of the United States of America." In 1955, this exclusionary language was eliminated and the statute was amended to cover only transportation "between points within

Any person liable for the tax is required to add it to the gross sales price and, "insofar as practicable," to collect it at the time the sales price is collected. § 10117, as amended.[3]

Appellant is a Michigan corporation engaged in the business of transporting motor vehicles by motor carrier for General Motors Corporation. General Motors assembles outside Mississippi vehicles that are destined for dealers within the State. The vehicles are then shipped by rail to Jackson, Miss., where, usually within 48 hours, they are loaded onto appellant's trucks and transported by appellant to the Mississippi dealers. App. 47–48, 78–79, 86–87. Appellant is paid on a contract basis for the transportation from the railhead to the dealers.[4]  *Id.*, at 50–51, 68.

By letter dated October 5, 1971, the Mississippi Tax Com-

---

this state." 1955 Miss. Laws, c. 109, § 10. The amendment gave the statute essentially the form it possessed during the period relevant here.

It might be argued that the statute as so amended evinces an intent to reach only intrastate commerce, and that it should be so construed. Appellant, however, does not make that argument, and the Supreme Court of Mississippi clearly viewed that statute as applying to both intrastate commerce and interstate commerce.

We are advised by the appellee that the tax has been applied only to commercial transactions in which a distinct service is performed and payment made for transportation from one point within the State to another point within the State. Tr. of Oral Arg. 34–35, 38.

[3] This statute is now § 27–65–31 of the 1972 Code. Violation of the requirements of the section is a misdemeanor. *Ibid.*

[4] The parties understandably go to great pains to describe the details of the bills of lading, and the responsibility of various entities for the vehicles as they travel from the assembly plant to the dealers. Appellant seeks to demonstrate that the transportation it provides from the railhead to the dealers is part of a movement in interstate commerce. Appellee argues that appellant's transportation is intrastate business, but further argues that even if the activity is part of interstate commerce, the tax is not unconstitutional. Brief for Appellant 11–14; Brief for Appellee 12–24; Reply Brief for Appellant 14–16. The Mississippi courts, in upholding the tax, assumed that the transportation is in interstate commerce. For present purposes, we make the same assumption.

mission informed appellant that it was being assessed taxes and interest totaling $122,160.59 for the sales of transportation services during the three-year period from August 1, 1968, through July 31, 1971.[5] Remittance within 10 days was requested. *Id.*, at 9–10. By similar letter dated December 28, 1972, the Commission advised appellant of an assessment of $42,990.89 for the period from August 1, 1971, through July 31, 1972. *Id.*, at 11–12. Appellant paid the assessments under protest and, in April 1973, pursuant to § 10121.1, as amended, of the 1942 Code (now § 27–65–47 of the 1972 Code), instituted the present refund action in the Chancery Court of the First Judicial District of Hinds County.

Appellant claimed that its transportation was but one part of an interstate movement, and that the taxes assessed and paid were unconstitutional as applied to operations in interstate commerce. App. 4, 6–7. The Chancery Court, in an unreported opinion, sustained the assessments. *Id.*, at 99–102.

The Mississippi Supreme Court affirmed. It concluded:

> "It will be noted that Taxpayer has a large operation in this State. It is dependent upon the State for police protection and other State services the same as other citizens. It should pay its fair share of taxes so long, but only so long, as the tax does not discriminate against interstate commerce, and there is no danger of interstate commerce being smothered by cumulative taxes of several states. There is no possibility of any other state duplicating the tax involved in this case." 330 So. 2d, at 272.

Appellant, in its complaint in Chancery Court, did *not* allege that its activity which Mississippi taxes does not have a

---

[5] Although appellant had been operating in Mississippi since 1960, App. 77, the state audit and assessment covered only the period beginning August 1, 1968. *Id.*, at 37–38. No effort had been made to apply the tax to appellant for any period prior to that date.

sufficient nexus with the State; or that the tax discriminates against interstate commerce; or that the tax is unfairly apportioned; or that it is unrelated to services provided by the State.[6] No such claims were made before the Mississippi Supreme Court, and although appellant argues here that a tax on "the privilege of engaging in interstate commerce" creates an unacceptable risk of discrimination and undue burdens, Brief for Appellant 20–27, it does not claim that discrimination or undue burdens exist in fact.

Appellant's attack is based solely on decisions of this Court holding that a tax on the "privilege" of engaging in an activity in the State may not be applied to an activity that is part of interstate commerce. See, e. g., *Spector Motor Service* v. *O'Connor*, 340 U. S. 602 (1951); *Freeman* v. *Hewit*, 329 U. S. 249 (1946). This rule looks only to the fact that the incidence of the tax is the "privilege of doing business"; it deems irrelevant any consideration of the practical effect of the tax. The rule reflects an underlying philosophy that interstate commerce should enjoy a sort of "free trade" immunity from state taxation.[7]

---

[6] See *Boston Stock Exchange* v. *State Tax Comm'n*, 429 U. S. 318 (1977); *General Motors Corp.* v. *Washington*, 377 U. S. 436 (1964); *Illinois Cent. R. Co.* v. *Minnesota*, 309 U. S. 157 (1940); *Ingels* v. *Morf*, 300 U. S. 290 (1937). See also *Standard Steel Co.* v. *Washington Rev. Dept.*, 419 U. S. 560 (1975), and *Clark* v. *Paul Gray, Inc.*, 306 U. S. 583 (1939).

[7] The Court summarized the "free trade" view in *Freeman* v. *Hewit*, 329 U. S., at 252:

"[T]he Commerce Clause was not merely an authorization to Congress to enact laws for the protection and encouragement of commerce among the States, but by its own force created an area of trade free from interference by the States. In short, the Commerce Clause even without implementing legislation by Congress is a limitation upon the power of the States. . . . This limitation on State power . . . does not merely forbid a State to single out interstate commerce for hostile action. A State is also precluded from taking any action which may fairly be deemed to have the effect of impeding the free flow of trade between States. It is immaterial that local commerce is subjected to a similar encumbrance."

Appellee, in its turn, relies on decisions of this Court stating that "[i]t was not the purpose of the commerce clause to relieve those engaged in interstate commerce from their just share of state tax burden even though it increases the cost of doing the business," *Western Live Stock* v. *Bureau of Revenue*, 303 U. S. 250, 254 (1938). These decisions [8] have considered not the formal language of the tax statute but rather its practical effect, and have sustained a tax against Commerce Clause challenge when the tax is applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State.

Over the years, the Court has applied this practical analysis in approving many types of tax that avoided running afoul of the prohibition against taxing the "privilege of doing business," but in each instance it has refused to overrule the prohibition. Under the present state of the law, the *Spector* rule, as it has come to be known, has no relationship to economic realities. Rather it stands only as a trap for the unwary draftsman.

## II

The modern origin of the *Spector* rule may be found in *Freeman* v. *Hewit, supra.*[9] At issue in *Freeman* was the ap-

---

[8] See, *e. g., General Motors Corp.* v. *Washington, supra; Northwestern Cement Co.* v. *Minnesota*, 358 U. S. 450 (1959); *Memphis Gas Co.* v. *Stone*, 335 U. S. 80 (1948); *Wisconsin* v. *J. C. Penney Co.*, 311 U. S. 435, 444 (1940).

[9] Although we mention *Freeman* as the starting point, elements of the views expressed therein, and the positions that underlie that debate, were evident in prior opinions. Compare *State Tax on Railway Gross Receipts*, 15 Wall. 284 (1873), with *Fargo* v. *Michigan*, 121 U. S. 230 (1887); and compare *Di Santo* v. *Pennsylvania*, 273 U. S. 34 (1927), and *Cooney* v. *Mountain States Tel. Co.*, 294 U. S. 384 (1935), with *Western Live Stock* v. *Bureau of Revenue*, 303 U. S. 250 (1938). See generally P. Hartman, State Taxation of Interstate Commerce (1953); Barrett, State Taxation of Interstate Commerce—"Direct Burdens," "Multiple Burdens," or What

plication of an Indiana tax upon "the receipt of the entire gross income" of residents and domiciliaries. 329 U. S., at 250. Indiana sought to impose this tax on income generated when a trustee of an Indiana estate instructed his local stockbroker to sell certain securities. The broker arranged with correspondents in New York to sell the securities on the New York Stock Exchange. The securities were sold, and the New York brokers, after deducting expenses and commission, transmitted the proceeds to the Indiana broker who in turn delivered them, less his commission, to the trustee. The Indiana Supreme Court sustained the tax, but this Court reversed.

Mr. Justice Frankfurter, speaking for five Members of the Court, announced a blanket prohibition against any state taxation imposed directly on an interstate transaction. He explicitly deemed unnecessary to the decision of the case any showing of discrimination against interstate commerce or error in apportionment of the tax. *Id.*, at 254, 256–257. He recognized that a State could constitutionally tax local manufacture, impose license taxes on corporations doing business in the State, tax property within the State, and tax the privilege of residence in the State and measure the privilege by net income, including that derived from interstate commerce. *Id.*, at 255. Nevertheless, a direct tax on interstate sales, even if fairly apportioned and nondiscriminatory, was held to be unconstitutional *per se*.

Mr. Justice Rutledge, in a lengthy concurring opinion, argued that the tax should be judged by its economic effects rather than by its formal phrasing. After reviewing the Court's prior decisions, he concluded: "The fact is that 'direct incidence' of a state tax or regulation . . . has long since been discarded as being in itself sufficient to outlaw state legislation." *Id.*, at 265–266. In his view, a state tax is unconsti-

Have You?, 4 Vand. L. Rev. 496 (1951), and writings cited therein at 496 n. 1; Dunham, Gross Receipts Taxes on Interstate Transactions, 47 Colum. L. Rev. 211 (1947).

tutional only if the activity lacks the necessary connection with the taxing state to give "jurisdiction to tax," *id.*, at 271, or if the tax discriminates against interstate commerce, or if the activity is subject to multiple taxation. *Id.*, at 276–277.[10]

The rule announced in *Freeman* was viewed in the commentary as a triumph of formalism over substance, providing little guidance even as to formal requirements. See P. Hartman, State Taxation of Interstate Commerce 200–204 (1953); Dunham, Gross Receipts Taxes on Interstate Transactions, 47 Colum. L. Rev. 211 (1947). Although the rule might have been utilized as the keystone of a movement toward absolute immunity of interstate commerce from state taxation,[11] the Court consistently has indicated that "interstate commerce may be made to pay its way," and has moved toward a standard of permissibility of state taxation based upon its actual effect rather than its legal terminology.

The narrowing of the rule to one of draftsmanship and phraseology began with another Mississippi case, *Memphis Gas Co.* v. *Stone,* 335 U. S. 80 (1948). Memphis Natural Gas Company owned and operated a pipeline running from Louisiana to Memphis. Approximately 135 miles of the line were in Mississippi. Mississippi imposed a "franchise or excise" tax measured by "the value of the capital used, invested or employed in the exercise of any power, privilege or right enjoyed by [a corporation] within this state." Miss. Code Ann., 1942, § 9313. The Mississippi Supreme Court upheld the tax, and this Court affirmed.

In an opinion for himself and two others, Mr. Justice Reed

---

[10] Mr. Justice Rutledge agreed with the result the Court reached in *Freeman* because of his belief that the apportionment problem was best solved if States other than the market State were forbidden to impose unapportioned gross receipts taxes of the kind Indiana sought to exact.

[11] A consistent application of the doctrine of immunity for interstate commerce, of course, would have necessitated overruling the cases approved by the *Freeman* Court that upheld taxes whose burden, although indirect, fell on interstate commerce.

noted that the tax was not discriminatory, that there was no possibility of multiple taxation, that the amount of the tax was reasonable, and that the tax was properly apportioned to the investment in Mississippi. 335 U. S., at 87–88. He then went on to consider whether the tax was "upon the privilege of doing interstate business within the state." *Id.*, at 88. He drew a distinction between a tax on "the privilege of doing interstate business" and a tax on "the privilege of exercising corporate functions within the State," and held that while the former is unconstitutional, the latter is not barred by the Commerce Clause. *Id.*, at 88–93. He then approved the tax there at issue because

> "there is no attempt to tax the privilege of doing an interstate business or to secure anything from the corporation by this statute except compensation for the protection of the enumerated local activities of 'maintaining, keeping in repair, and otherwise in manning the facilities.' " *Id.*, at 93.

Mr. Justice Black concurred in the judgment without opinion. *Id.*, at 96. Mr. Justice Rutledge provided the fifth vote, stating in his concurrence:

> "[I]t is enough for me to sustain the tax imposed in this case that it is one clearly within the state's power to lay insofar as any limitation of due process or 'jurisdiction to tax' in that sense is concerned; it is nondiscriminatory, that is, places no greater burden upon interstate commerce than the state places upon competing intrastate commerce of like character; is duly apportioned, that is, does not undertake to tax any interstate activities carried on outside the state's borders; and cannot be repeated by any other state." *Id.*, at 96–97 (footnotes omitted).

Four Justices dissented, *id.*, at 99, on the grounds that it had not been shown that the State afforded any protection in

return for the tax,[12] and that, therefore, the tax must be viewed as one on the "privilege" of engaging in interstate commerce. The dissenters recognized that an identical effect could be achieved by an increase in the ad valorem property tax, *id.*, at 104, but would have held, notwithstanding, that a tax on the "privilege" is unconstitutional.

The prohibition against state taxation of the "privilege" of engaging in commerce that is interstate was reaffirmed in *Spector Motor Service* v. *O'Connor,* 340 U. S. 602 (1951), a case similar on its facts to the instant case. The taxpayer there was a Missouri corporation engaged exclusively in interstate trucking. Some of its shipments originated or terminated in Connecticut. Connecticut imposed on a corporation a "tax or excise upon its franchise for the privilege of carrying on or doing business within the state," measured by apportioned net income. *Id.*, at 603–604, n. 1. Spector brought suit in federal court to enjoin collection of the tax as applied to its activities. The District Court issued the injunction. The Second Circuit reversed. This Court, with three Justices in dissent, in turn reversed the Court of Appeals and held the tax unconstitutional as applied.

The Court recognized that "where a taxpayer is engaged both in intrastate and interstate commerce, a state may tax the privilege of carrying on intrastate business and, within reasonable limits, may compute the amount of the charge by applying the tax rate to a fair proportion of the taxpayer's business done within the state, including both in-

---

[12] In arriving at this conclusion, the dissent relied upon a construction of a stipulation entered into by the parties, 335 U. S., at 100–101, and upon an independent review of the record. The plurality rejected the dissent's reading of the stipulation and noted, in addition, that the question presented in the petition for certiorari did not raise a claim that the State was providing no service for which it could ask recompense. *Id.*, at 83–84. The plurality then relied on the Supreme Court of Mississippi's holding that the State did provide protection that could properly be the subject of a tax.

terstate and intrastate." *Id.*, at 609–610 (footnote omitted). It held, nevertheless, that a tax on the "privilege" of doing business is unconstitutional if applied against what is exclusively interstate commerce. The dissenters argued, on the other hand, *id.*, at 610, that there is no constitutional difference between an "exclusively interstate" business and a "mixed" business, and that a fairly apportioned and nondiscriminatory tax on either type is not prohibited by the Commerce Clause.

The *Spector* rule was applied in *Railway Express Agency* v. *Virginia,* 347 U. S. 359 (1954) (*Railway Express I*), to declare unconstitutional a State's "annual license tax" levied on gross receipts for the "privilege of doing business in this State." The Court, by a 5-to-4 vote, held that the tax on gross receipts was a tax on the privilege of doing business rather than a tax on property in the State, as Virginia contended.

Virginia thereupon revised the wording of its statute to impose a "franchise tax" on "intangible property" in the form of "going concern" value as measured by gross receipts. The tax was again asserted against the Agency which in Virginia was engaged exclusively in interstate commerce. This Court's opinion, buttressed by two concurring opinions and one concurrence in the result, upheld the reworded statute as not violative of the *Spector* rule. *Railway Express Agency* v. *Virginia,* 358 U. S. 434 (1959) (*Railway Express II*). In upholding the statute, the Court's opinion recognized that the rule against taxing the "privilege" of doing interstate business had created a situation where "the use of magic words or labels" could "disable an otherwise constitutional levy." *Id.*, at 441.

There was no real economic difference between the statutes in *Railway Express I* and *Railway Express II*. The Court long since had recognized that interstate commerce may be made to pay its way. Yet under the *Spector* rule, the economic realities in *Railway Express I* became irrelevant. The

*Spector* rule had come to operate only as a rule of draftsmanship, and served only to distract the courts and parties from their inquiry into whether the challenged tax produced results forbidden by the Commerce Clause.

On the day it announced *Railway Express II,* the Court further confirmed that a State, with proper drafting, may tax exclusively interstate commerce so long as the tax does not create any effect forbidden by the Commerce Clause. In *Northwestern Cement Co.* v. *Minnesota,* 358 U. S. 450 (1959), the Court held that net income from the interstate operations of a foreign corporation may be subjected to state taxation, provided the levy is not discriminatory and is properly apportioned to local activities within the taxing State forming sufficient nexus to support the tax. Limited in that way, the tax could be levied even though the income was generated exclusively by interstate sales. *Spector* was distinguished, briefly and in passing, as a case in which "the incidence" of the tax "was the privilege of doing business." 358 U. S., at 464.

Thus, applying the rule of *Northwestern Cement* to the facts of *Spector,* it is clear that Connecticut could have taxed the apportioned net income derived from the exclusively interstate commerce. It could not, however, tax the "privilege" of doing business as measured by the apportioned net income. The reason for attaching constitutional significance to a semantic difference is difficult to discern.

The unsatisfactory operation of the *Spector* rule is well demonstrated by our recent case of *Colonial Pipeline Co.* v. *Traigle,* 421 U. S. 100 (1975). Colonial was a Delaware corporation with an interstate pipeline running through Louisiana for approximately 258 miles. It maintained a work force and pumping stations in Louisiana to keep the pipeline flowing, but it did no intrastate business in that State. *Id.,* at 101–102. In 1962, Louisiana imposed on Colonial a franchise tax for "the privilege of carrying on or doing business" in the State. The Louisiana Court of Appeal invalidated the

tax as violative of the rule of *Spector*. *Colonial Pipeline Co.* v. *Mouton*, 228 So. 2d 718 (1969). The Supreme Court of Louisiana refused review. 255 La. 474, 231 So. 2d 393 (1970). The Louisiana Legislature, perhaps recognizing that it had run afoul of a rule of words rather than a rule of substance, then redrafted the statute to levy the tax, as an alternative incident, on the "qualification to carry on or do business in this state or the actual doing of business within this state in a corporate form." Again, the Court of Appeal held the tax unconstitutional as applied to the appellant. *Colonial Pipeline Co.* v. *Agerton*, 275 So. 2d 834 (1973). But this time the Louisiana Supreme Court upheld the new tax. 289 So. 2d 93 (1974)

By a 7-to-1 vote, this Court affirmed. No question had been raised as to the propriety of the apportionment of the tax, and no claim was made that the tax was discriminatory. 421 U. S., at 101. The Court noted that the tax was imposed on that aspect of interstate commerce to which the State bore a special relation, and that the State bestowed powers, privileges, and benefits sufficient to support a tax on doing business in the corporate form in Louisiana. *Id.*, at 109. Accordingly, on the authority of *Memphis Gas*, the tax was held to be constitutional. The Court distinguished *Spector* on the familiar ground that it involved a tax on the privilege of carrying on interstate commerce, while the Louisiana Legislature, in contrast, had worded the statute at issue "narrowly to confine the impost to one related to appellant's activities within the State in the corporate form." 421 U. S., at 113–114.[13]

---

[13] Five Members of the Court joined in the opinion distinguishing *Spector*. Two concurred in the judgment, but viewed *Spector* as indistinguishable and would have overruled it. 421 U. S., at 114–116. One also viewed *Spector* as indistinguishable, but felt that it was an established precedent until forthrightly overruled. *Id.*, at 116. Mr. Justice Douglas took no part.

While refraining from overruling *Spector,* the Court noted:

"[D]ecisions of this Court, particularly during recent decades, have sustained nondiscriminatory, properly apportioned state corporate taxes upon foreign corporations doing an exclusively interstate business when the tax is related to a corporation's local activities and the State has provided benefits and protections for those activities for which it is justified in asking a fair and reasonable return." *Id.,* at 108.

One commentator concluded: "After reading *Colonial,* only the most sanguine taxpayer would conclude that the Court maintains a serious belief in the doctrine that the privilege of doing interstate business is immune from state taxation." Hellerstein, State Taxation of Interstate Business and the Supreme Court, 1974 Term: *Standard Pressed Steel* and *Colonial Pipeline,* 62 Va. L. Rev. 149, 188 (1976).[14]

## III

In this case, of course, we are confronted with a situation like that presented in *Spector.* The tax is labeled a privilege tax "for the privilege of . . . doing business" in Mississippi, § 10105 of the State's 1942 Code, as amended, and the activity taxed is, or has been assumed to be, interstate commerce. We note again that no claim is made that the activity is not sufficiently connected to the State to justify a tax, or that the tax is not fairly related to benefits provided the taxpayer, or that the tax discriminates against interstate commerce, or that the tax is not fairly apportioned.

---

[14] Less charitably put: "In light of the expanding scope of the state taxing power over interstate commerce, *Spector* is an anachronism. . . . Continued adherence to *Spector,* especially after *Northwestern States Portland Cement,* cannot be justified." Comment, Pipelines, Privileges and Labels: Colonial Pipeline Co. v. Traigle, 70 Nw. U. L. Rev. 835, 854 (1975).

The view of the Commerce Clause that gave rise to the rule of *Spector* perhaps was not without some substance. Nonetheless, the possibility of defending it in the abstract does not alter the fact that the Court has rejected the proposition that interstate commerce is immune from state taxation:

> "It is a truism that the mere act of carrying on business in interstate commerce does not exempt a corporation from state taxation. 'It was not the purpose of the commerce clause to relieve those engaged in interstate commerce from their just share of state tax burden even though it increases the cost of doing business.' *Western Live Stock* v. *Bureau of Revenue,* 303 U. S. 250, 254 (1938)." *Colonial Pipeline Co.* v. *Traigle,* 421 U. S., at 108.

Not only has the philosophy underlying the rule been rejected, but the rule itself has been stripped of any practical significance. If Mississippi had called its tax one on "net income" or on the "going concern value" of appellant's business, the *Spector* rule could not invalidate it. There is no economic consequence that follows necessarily from the use of the particular words, "privilege of doing business," and a focus on that formalism merely obscures the question whether the tax produces a forbidden effect. Simply put, the *Spector* rule does not address the problems with which the Commerce Clause is concerned.[15] Accordingly, we now reject the rule of

---

[15] It might be argued that "privilege" taxes, by focusing on the doing of business, are easily tailored to single out interstate businesses and subject them to effects forbidden by the Commerce Clause, and that, therefore, "privilege" taxes should be subjected to a *per se* rule against their imposition on interstate business. Yet property taxes also may be tailored to differentiate between property used in transportation and other types of property, see *Railway Express II,* 358 U. S. 434 (1959); an income tax could use different rates for different types of business; and a tax on the "privilege of doing business in corporate form" could be made to change with the nature of the corporate activity involved. Any tailored tax of this sort creates an increased danger of error in apportionment, of discrimina-

*Spector Motor Service, Inc.* v. *O'Connor,* that a state tax on the "privilege of doing business" is *per se* unconstitutional when it is applied to interstate commerce, and that case is overruled.

There being no objection to Mississippi's tax on appellant except that it was imposed on nothing other than the "privilege of doing business" that is interstate, the judgment of the Supreme Court of Mississippi is affirmed.

*It is so ordered.*

---

tion against interstate commerce, and of a lack of relationship to the services provided by the State. See *Freeman* v. *Hewit,* 329 U. S., at 265–266, n. 13 (concurring opinion). A tailored tax, however accomplished, must receive the careful scrutiny of the courts to determine whether it produces a forbidden effect on interstate commerce. We perceive no reason, however, why a tax on the "privilege of doing business" should be viewed as creating a qualitatively different danger so as to require a *per se* rule of unconstitutionality.

It might also be argued that adoption of a rule of absolute immunity for interstate commerce (a rule that would, of course, go beyond *Spector*) would relieve this Court of difficult judgments that on occasion will have to be made. We believe, however, that administrative convenience, in this instance, is insufficient justification for abandoning the principle that "interstate commerce may be made to pay its way."